The action is to recover the balance due on an alleged contract for the sale and delivery of a lot of lumber by the plaintiff to the defendant.
The latter denies that any such contract was entered into, and further sets up a counterclaim, based upon allegations of fact contained in his answer, not material to be stated.
Two issues were submitted to the jury:
1. Did the plaintiff furnish material to the defendant under a contract with him?
Answer: Yes.
2. If so, what sum, if any, is due from the defendant to the (662) plaintiff for such material?
A. Six hundred and thirty-nine dollars and sixty-five cents, with interest from 1 November, 1886.
As the controversy is essentially upon the point of the defendant's responsibility upon any contract, express or implied, to the plaintiff for the lumber furnished and used in the construction of the defendant's dwelling, it is necessary to set out the evidence pertinent to that issue, abbreviated only, or omitted, when it passes beyond the scope of that inquiry.
The plaintiff, after stating that he had furnished lumber to build the house in Durham in which the defendant lives, and testifying to various entries of lumber in his books, which were exhibited, between 18 August and 24 December, 1886, proceeded thus:
"First time I spoke to Mr. Guthrie was on 13 November. I presented him bill on 13th, including all lumber, except Bush Hill bill, and asked him for the money; his reply was, I must look to the man I sold the lumber to. I told him that was just what I was doing. I sold him the lumber; gave him the credit through his agent Pugin. He said, well, he didn't know anything about it, and couldn't pay it. I insisted on the payment, and he suggested we walk down to Mr. Pugin's office; we did so; had a talk with him (Pugin) about it. I stated to Pugin what I had stated to Mr. Guthrie; this was in Mr. Guthrie's presence; and told him what Mr. Guthrie's reply was. I asked Mr. Pugin if he didn't instruct me to send this lumber to Mr. Guthrie's house, and he would see I got the money for it? Pugin said he did. I further asked if he didn't tell me that he paid Mr. Guthrie's money out, and would see that Mr. Ransley paid all the bills? He said he did tell me so, and I needn't to be uneasy, I would get my money; that there was a sufficient amount still due on the contract to pay all the bills; and further stated about the amount that had been paid on the contract — about *Page 516 
(663) $1,900, the contract being for about $3,500 — would leave a balance of about $1,600 still due. I asked Mr. Pugin, in Mr. Guthrie's presence, if he didn't tell me he was Mr. Guthrie's agent; that all the money passed through his hands, and that he would see that I got my money? Mr. Guthrie said that he couldn't go round town assuming everybody's bill; that he didn't buy the lumber, and wouldn't pay for it, unless there was a surplus after the house was completed. Pugin then went on to say how much money it would take to complete the house; said it would take $600 or $700, and wouldn't certainly exceed $1,000. I then told Mr. Guthrie that I had just sent an order off from Mr. Pugin for his inside work, which I should countermand by that train unless he paid these bills. he turned off and said, `All right!' and walked out of Mr. Pugin's office; turned and came back, and said, about that Bush Hill order, `Don't countermand that order, let it come along, and when the bill comes send it to me, and I'll send you my check for it'; and instructed me, at the same time, to charge it up to his private account. He turned and went off, and said no more right then; last I saw of him for several days. After that time — some time after first talk — had a talk with him on the street; I asked him to settle the bills for lumber I presented. He said he never intended to settle them till he did it at the end of the law. I then told him that I should sue him; that I had sent the lumber there by the request of his agent (Pugin), and should sue him unless he paid them. He said, `All right!' and walked off."
Notwithstanding the defendant's objections, the court admitted the above conversations in evidence and defendant excepted.
Plaintiff further testified as follows:
"The first of the Bush Hill bill arrived 9 December, last about 24th; didn't know at time what bill would amount to Mr. Guthrie, in Pugin's office, did not deny that Pugin was his agent. All my bills, (664) exclusive of Bush Hill, amount to $636.97, before any payment. He paid $100 13 November, after conversation in Pugin's office and before Bush Hill bill arrived; got the money on that check. I credited this amount on bill of lumber I furnished Mr. Guthrie. At that time he owned me no other debt; had had no dealings with him up to that time."
Cross-examined: "Bush Hill bill was rendered to me 15 March; paid the bill few days after I got it; think the first bill sent to me was turned over to Mr. Guthrie. This was after I brought this suit. Ransley was building Mr. Guthrie's house. I didn't sell any lumber to Ransley. I very often got checks like the one shown; have never made any charge to Ransley. The items of 18 August, 1886, to 4 September, are charged *Page 517 
to W. A. Guthrie; this from the ledger. On the journal, 18 August, 1886, Joseph Ransley for W. A. Guthrie's house.' This is just as it stood there the day the entry was made. I made the entries to suit my own convenience in keeping books. The reason I charged to Ransley was because he gave orders on Guthrie for the lumber. (Order shown. Its introduction objected to by defendant. Objection overruled and defendant excepted.) Dated 4 September, includes bill from 18 August to 4 September; this order was presented to Mr. Pugin; can't say I ever showed this order to Guthrie; may have done it. 19 November (this order was read to the jury) — this order was for lumber I furnished Mr. Guthrie at the instance of Mr. Pugin; Pugin said when I presented the order it was all right, and he would write to Mr. Guthrie and get the money and pay it off."
The defendant objected to the order of 4 September, but the plaintiff's counsel insisted that, as the defendant asked on the cross-examination the reason the plaintiff charged bills to Ransley, and the plaintiff gave as his reason that Ransley gave orders on Guthrie for the money, he should have the privilege of sustaining his statement by (665) showing the order in evidence as part of his explanation. The defendant's objection was overruled, and he excepted.
Plaintiff testified further, on cross-examination, as follows: "Lumber was delivered between 18 August and 4 September to Mr. Hill, Ransley's foreman; entry on the journal 6 September is `Joseph Ransley for W. A. Guthrie.' This entry has been changed; was changed in November to correspond with first entry. When the account was opened with Mr. Guthrie, it was opened `W. A. Guthrie, by T. E. Hill'; this was on 16 November. When that change was made, don't know whether Ransley had left here or not; didn't know whether he was insolvent or not; didn't see him for some time before he left. It originally stood, `6 September, W. A. Guthrie, by Joseph Ransley'; changed all to `Joseph Ransley for W. A. Guthrie,' that were not made that way originally, to make them correspond with 18 August and 4 September. About 16 November changed the bills of 4 September is charged `Jos. Ransley for not since changed them. 4 September and 18 August, and have W. A. Guthrie.' When these entries (18 August and 4 September) were made, had no orders from Ransley; gave credit to Guthrie because Pugin instructed me to send him anything he wanted, and he would pay the bill. When Mr. Guthrie commenced to buy lumber he instructed me to charge it to him by Mr. Hill, or to let Hill have what he wanted upon a written order signed by Hill. Never had any contract with Guthrie, but with Pugin, who represented himself as Guthrie's agent; never had any agreement with Guthrie personally before 13 *Page 518 
November; never had any agreement with Guthrie personally on 13 November, or after, for lumber Ransley got. My clerks made change under my directions to correspond with first entry. The changes on books might have been made before 13 November, or after that (666) time. On the ledger the charge is to W. A. Guthrie direct. All of the lumber charged on books was delivered before 13 November, except 4,000 laths delivered on that day before I saw Guthrie."
On redirect examination plaintiff testified as follows: "Ransley applied to me for bill of lumber for Guthrie's house. I refused him. He was a perfect stranger to me; knew nothing about him. (Order sent for Bush Hill lumber introduced, dated 12 November, 1886. Copy will be sent, marked `D.') Bought Bush Hill bill in my own name and sold it to Guthrie. In Southgate's office, showed Guthrie bills of lumber furnished. No other sum but $100 has ever been paid; nothing on Bush Hill bill has been paid except freight."
The plaintiff here rested his case, and the defendant testified in his own behalf as follows:
"I made no contract with Wiggins prior to 13 November, 1886, and never made any with him in regard to lumber, furnished by him, and for which he has sued in this action, except the Bush Hill bill. Up to 13 November, 1886, never had any business dealings with Mr. Wiggins whatever about this or any other matter. I was living in Fayetteville up to and after 13 November, and until my house was completed, about 1 March, 1887. Came to Durham 13 November for the purpose of looking after work on my house, and to see Ransley, with whom I had contracted to build it. On arriving in Durham, came down street and met Mr. Wiggins, who, at the time was a stranger to me, near where Johnson's drug store now is, on sidewalk. He came up and spoke to me, and inquired of me if I knew where Mr. Ransley was, and called him in the conversation my contractor. I replied to him I did not; had been informed he was sick. Wiggins then remarked he wanted to see him; that he had a bill against him for lumber he had furnished to build my house. I replied to him I knew nothing about it; that I had contracted with Ransley to (667) furnish everything and give me a complete job for so much money; think I stated the amount; told him I had nothing to do with buying materials or furnishing. Wiggins then said, `I have furnished him lumber, and I want my pay out of somebody. I replied to him that he would have to look to the man he sold the lumber to; that I had bought no lumber from him, and I didn't intend to pay him for it; told him my house was then, as he well knew, hardly half finished; that when it was finished I was ready to pay for it; if there *Page 519 
was any surplus left over, or balance going to contractor, it was a matter of no concern to me whether the contractor got it or he got it; that what I wanted was the completion of the contract by Ransley. He didn't at that time show me any bill, or state to me the amount of it. That's about all that occurred in that conversation; all that I remember. Some time after that, but during same day, I met Wiggins again, and he again asked me if I would become responsible — this I think, at Southgate's office — for Ransley's bills. I told him I would not, and I think he pulled a paper out of his pocket which he claimed to be a bill. I declined to read it or accept it; told him I had nothing to do with it; that it was a matter entirely between him and Mr. Ransley. I called his attention to the fact I had already told him I would have nothing to do with it. He then remarked, `Ransley gave me an order for some stuff for your house that couldn't be had here, and that was ordered from some manufacturers of building supplies at Bush Hill, N.C. and, says he, `if I can't get pay for what I have already furnished Ransley, I will stop the shipment of the Bush Hill stuff.' I told him he could do just as he pleased about that; that I didn't intend to assume, as my own, any obligation whatever that he had against Ransley. With that we separated. I think both these conversations occurred about the middle of the day. In the evening of that day I was in Pugin's office. Pugin had been employed by me as an architect, and not as a builder, to (668) supervise the construction of my house, and see that Ransley did the work according to his contract. Wiggins came in again, spoke about wanting pay for the bill he had against Ransley, and again threatened to countermand the order for the Bush Hill stuff. I distinctly refused again to become responsible for the first indebtedness of Ransley to Wiggins, but I told Wiggins that, to avoid delay in the finishing up of the house — that I was anxious to get into it — if he would not countermand that order I would assume and pay the bill, if Ransley didn't do it; I would see, as to that, he suffered no damage. Wiggins then went off, and I had no further conversation with him that day. In conversation at Pugin's office, and in no other conversation I had with Wiggins that day did he pretend to me that any part of his claim arose out of any contract between him and Pugin as my agent. It is only since this litigation commenced that I ever heard of such claim. Pugin was not my agent for the purpose of buying material to build my house prior to 13 November, 1886; I don't deny I employed him after that date to buy material; had Pugin employed August, September, October, up to 13 November, simply as an architect; that was the extent of his authority. No such *Page 520 
statement was made that he sold me the lumber and gave me the credit. Wiggins didn't pretend to have dealt with Pugin at all; didn't pretend that Ransley gave him orders. Wiggins did not state, in presence of Pugin, that Pugin had acted as my agent in purchase of this lumber; nothing said by Wiggins about Pugin being my agent. I paid Vanoppen's expenses to go to Bush Hill and back, $10; when stuff came it was not according to the order; went to Wiggins and said, I consider myself as standing between you and Petty Co., and told him if he paid it I intended to contest it; was willing to pay something for it, but not full price; sash and doors not delivered till about (669) Christmas; on this account plastering froze in three rooms of the house; had to be replastered; damage $15; $50 damage in completing the house; no transoms furnished; had to have them made to order; delayed every time; cost me $26.28. In this was included such for windows on north side of the house; no sash came for that window; window-sash had a very wide bottom rail; glass had to be cut; incurred expense to cut glass, $12; sash not made to fit frame; square sash for arched frames; closet doors had to be cut down; doors of green lumber; shrank; damaged $115. Offered to pay Wiggins $105, in full settlement of the whole thing; he declined; I offered it in writing; I delivered the check to Hill, Mr. Ransley's foreman, and told him to take it and give it to Mr. Wiggins. At that time I supposed it covered all Wiggins' claims; knew nothing to the contrary. I paid the $100 for Ransley. Don't remember the conversation at Blacknall's corner. In notified Wiggins to produce his books; examined them, and made memorandum."
Cross-examined. — "Discharged Joseph Ransley 17 November. Bill for Bush Hill lumber in Pugin's handwriting; Pugin ordered ballusters and I paid; and wall paper. All this after Ransley was discharged. At time Pugin made order for glass I knew nothing about it; it was ordered before Ransley left.
On 13 November, I had overpaid Ransley for all the work he had done and material furnished."
Pugin, introduced for defendant, testified as follows: "I was employed by Guthrie as architect and superintendent. This embraced making designs for house and superintending construction. I was not authorized to buy material; didn't tell Wiggins so, as I recollect; was not authorized by Mr. Guthrie to accept orders drawn by Ransley on him; never notified Guthrie of order drawn by Ransley on him in favor of Wiggins; never told Guthrie verbally of the order. Don't remember any such conversation that Wiggins said in my office (670) that I represented to him I was Guthrie's agent to buy lumber. First time I ever saw Wiggins he was asking me for pay for *Page 521 
lumber he furnished for defendant's house. I told Mr. Wiggins that Mr. Guthrie sent me money, and if Ransley would give an order I would pay. I did tell him I had no doubt Guthrie would pay for all the lumber he put into the house; that the contract price was enough to finish it; this was an opinion. Guthrie did not authorize me to make such statement. Guthrie made his payments to Ransley in checks; to Joseph Ransley or order."
Cross-examined. — "Bush Hill bill pretty generally filled the order. There was paid up to 13 November, $1,125."
Defendant here closed, and the plaintiff introduced T. E. Hill, who testified as follows: "What Wiggins sent was used there; he delivered lumber there. The 13 November met in Pugin's office; notice of Ransley's discharge given to me forenoon of Saturday 13th; gave it to Ransley in the evening. Check of $100 for Wiggins was given to me in the morning of the 13th. Tuesday, 16th, I ordered first bill from Wiggins; I had then taken charge for Mr. Guthrie. The check 13 November, gave it to Wiggins before notice to Ransley; gave Ransley notice after supper. . . . Guthrie gave me checks to pay Ransley's hands; Ransley knew nothing about it till I told him."
Cross-examined. — "I was foreman for Ransley both on Guthrie's house and church; Ransley furnished to both places. Pugin suggested the amounts to be paid."
Plaintiff then introduced Mr. Lloyd, who testified: "Mr. Pugin came into my store; I sent for him, and asked him if he was Mr. Guthrie's agent; he said he was, and all the money was passing through his hands, and he accepted the order."
At the commencement of the trial, the defendant demanded payment on his counterclaim because no reply was filed thereto. The court ruled that the counterclaim, considered as a cross-action, (671) seeking affirmative relief, was not within the jurisdiction of the court, as the demand was under two hundred dollars and founded on contract, but that defendant might have the benefit of it as a recoupment. To this ruling defendant excepted. The defendant afterwards took advantage of his counterclaim as a recoupment, and the court, without objection on the part of the defendant, charged the jury fully as to rights of defendant under his counterclaim, and particularly and in detail called the attention of the jury to the evidence of defendant tending to show that he had sustained damages, as alleged in his counterclaim, and told the jury that if they should find the first issue for the plaintiff, they should reduce the amount of any claim they might find plaintiff entitled to recover by the amount of the damages which defendant had shown, by a preponderance of evidence, he had sustained. At the close of the evidence defendant requested the court *Page 522 
to put its instructions to the jury in writing, and the judge at once wrote the following (and handed them to counsel for defendant), to wit:
"1. If the jury are satisfied, by preponderance of the evidence, that the plaintiff sold and delivered to defendant the lumber, the value of which he sues for in this action, they will answer the first issue in the affirmative.
2. If the lumber was sold and delivered to Pugin as agent for defendant, and Pugin was defendant's agent to purchase such lumber, this would be, in law, precisely the same thing as a sale and delivery to the defendant personally, and the jury should answer the first issue in the affirmative.
3. If Pugin, professing to be the agent of defendant, purchased and received such lumber for defendant, and defendant subsequently ratified such purchase, the jury should answer the first issue (672) in the affirmative.
In addition to the written instructions, the court, without objection on the part of the defendant, explained to the jury that they should answer the first issue "yes," if they were satisfied, by a preponderance of the evidence, that the plaintiff furnished the defendant the Bush Hill bill of material under a contract with defendant, and called the attention of the jury to the evidence on both sides in regard to that bill of lumber, and further to the jury without objection that if they found the first issue in the affirmative, it would be for them to ascertain, in passing upon the second issue, whether defendant's contract with the plaintiff embraced only the Bush Hill bill of lumber, or whether it included the bills claimed by plaintiff to have been furnished by him to defendant between the 18th of August and 13th of November. The court then directed the attention of the jury to the evidence on both sides bearing upon these questions, and impressed upon them that the onus was upon the plaintiff.
The defendant requested the following special instructions:
"1. To constitute a sale of personal property, delivery of the article to the purchaser (either actual delivery or symbolical, as by written bill of sale) is necessary, and when the delivery is had the sale is then complete. There is no such thing as a vendor's lien recognized in North Carolina, and when the vendor parts with the possession, by delivery to the purchaser, his right to the property thereupon ceases, and the title passes to the vendee unencumbered, unless the vendee should enter into mortgage on the property, or sign a conditional bill of sale. If Ransley contracted with Guthrie to build and complete his house, and furnish lumber and other material himself for that purpose, and the plaintiff contracted with Ransley to sell to him the lumber, etc., embraced in the account sued on, and, pursuant to *Page 523 
contract with Ransley, in the months of August, September, October and up to 13 November, 1886, delivered to Ransley the articles embraced in his account for that time, then he cannot recover for these items against Guthrie. And it makes no difference, (673) in this view of the case, that the articles were delivered on Guthrie's premises, not that they were used in building the house Guthrie now occupies."The court said there was no evidence in the case calling for this instruction as a whole, and such parts of it as are necessary to be given are embraced in the general charge to the jury. The instruction was therefore refused.
"2. If the jury find the lumber was sold and delivered to Ransley under an express contract with him, then the using of the materials on Guthrie's premises, and to build a house for Guthrie, will not, in law, raise any implication against Guthrie, nor bind him under an implied contract, to pay for the same. If there was an express contract with Ransley, then that would exclude all idea of an implied contract with Guthrie." (Given.) "If the plaintiff sold and delivered the lumber in August, September, October, and up to 13 November, 1886, to Pugin, as the agent of Guthrie, then such sale and delivery to Pugin, as Guthrie's agent, will not bind Guthrie, unless there was the relation of Principal and agent subsisting at the time between Guthrie and Pugin, and to bind Guthrie the plaintiff must prove such agency by a preponderance of evidence."
No. 3 was given with this addition:
"Unless the jury shall be satisfied, by a preponderance of the evidence, that Guthrie ratified Pugin's acts."
"4. That if the bills of the lumber of August, September, October, and up to 13 November, 1886, were sold and delivered to Ransley under contract between the plaintiff and Ransley, then the same became the debt of Ransley, and the plaintiff could not, under the Statute of Frauds, hold Guthrie responsible, unless Guthrie bound himself in writing to pay it. That the giving of the check for $100, 13 November, 1886, by Guthrie, was not, in law, sufficient to bind him to pay the full amount of Ransley's then indebtedness to the plaintiff, (674) as there is no evidence in the case and no contention on the part of the plaintiff that defendant is or has made himself any way responsible for Ransley's debt." (Refused.)
"5. That if the plaintiff paid the bill of W. C. Petty Co., of Bush Hill, after notice from Guthrie of the grounds, of his counterclaim, then that bill is subject to the amount if any, which you shall find due to Guthrie for his counterclaim." (Given.)
"6. That if Wiggins paid to Petty Co. the Bush Hill bill of $127.68after 19 February, 1887, when his suit was commenced, then *Page 524 
he cannot recover anything in this action on account of such payment." (Refused, because plaintiff does not seek to recover on such grounds.)
"7. That the burden of proof is upon the plaintiff, and it is his duty, by a preponderance of evidence, to satisfy the jury that the defendant contracted with him to furnish the material, and if he has failed to satisfy the jury he is not entitled to recover." (Given.)
Defendant moved for a rule for a new trial upon the following grounds:
1. Because his Honor refused the defendant's special instructions Nos. 1, 4 and 6.
2. Because, in giving defendant's special instruction No. 3, his Honor gave the same with the modification and qualification written below it on same paper.
3. Because his Honor charged the jury as set forth in his written instructions numbered 1, 2 and 3.
4. Because his Honor overruled the defendant's exceptions to evidence and admitted the same in behalf of plaintiff, as follows, viz.: "The evidence, exceptions to which are noted in his Honor's notes of the evidence, and such other exceptions to evidence as (675) defendant may desire to have put into the case," such being the understanding in taking down the evidence."
New trial refused, and defendant appealed.
Upon the introduction of the plaintiff as a witness on his own behalf, objection was made to his testifying in support of the claim, because when demanded, he had failed to furnish a bill of particulars thereof under sec. 259 of The Code. This section declares that while "it shall not be necessary for a party to set forth in a pleading the items of an account therein alleged, but he shall deliver to the adverse party, within ten days after a demand in writing, a copy of the account, which, if the pleading is verified, must be verified by his own oath, or that of his agent or attorney, if within the personal knowledge of such agent or attorney, to the effect that he believes it to be true, or to be precluded from giving evidence thereof," etc.
This enactment, which, in case of a disregard of the demand, shuts out all proof of the items of the claim coming from any witness (and does not close the mouth of the party making it alone), is intended to meet the case of a complaint that does not set out the particulars, and confine the evidence at the trial to such as are set forth. It aim *Page 525 
is to supply an omission to give them in the pleadings, and hence, when furnished, they become substantially and in legal effect a part of the complaint itself. The People v. Monroe, 4 Wend., 200.
"The better practice," says the court in Kellogg v. Paine, 8 How. Pr. Rep., 329, "is for a party who intends to preclude his adversary from proving an account on the ground that he has not complied with a demand, or an order for the particulars of such account, to apply for an order to that effect before the trial, so as to have the question settled before the trial." The propriety of this course (676) is strikingly manifest in this case.
But a complete answer to the objection is furnished in the fact that such bill is attached to the complaint, and made, by reference, a part of it, so that no such demand is authorized, unless the statement is defective; and the appropriate remedy for this is an application to the court for a more definite bill, in which the defects should be pointed out.Kellogg v. Paine, supra.
There was no error in receiving the testimony offered.
We do not set out the building contract made between Ransley and the defendant, which is full and minute in its specifications and contemplates a complete and finished job undertaken by the former for a fixed price to be paid by the latter.
The next exception was taken during the cross-examination of the plaintiff, to the production of an order under date of 4 September, 1886, drawn by Ransley on the defendant in favor of the plaintiff for $258.65, which was referred to in explanation of and giving reasons for an entry on plaintiff's journal. The exhibition of the order was a verification of what he was saying about its contents, and is part of the cross-examination itself. The reason given for the ruling to receive the order as evidence for the limited purpose mentioned is entirely satisfactory in sustaining it.
The further objection to what was said by the witness that led to the production of the order is quite as untenable, as it was elicited by the defendant's counsel without interference until the evidence was out. As is said in the opinion in McRae v. Malloy, 93 N.C. 154
the defendant, "if opposed to the giving in of the testimony, should have interposed and arrested the examination, or if this could not be done in time, should have asked the judge to require its withdrawal or direct the jury to disregard it, so that it would become harmless. But it is not admissible for counsel to be quite and (677) allow the evidence to come out and take advantage of it if favorable, and if not to ask that it be stricken out and not considered." If we misinterpret the record as to the time when the objection was *Page 526 
made, we see no intrinsic objection to the matter of the testimony itself, and for the reasons given by the presiding judge it was competent.
The next exception is to the ruling made at the commencement of the trial, that what the answer sets up as a counterclaim being less than $200, and cognizable in a justice's court only, could not be enforced as a demand for affirmative relief, but the defendant could avail himself of it as a recoupment in reducing the plaintiff's demand. This accorded to the defendant all the benefit to which he was entitled, and he should be content in being allowed to use it for this purpose. But the objection disappears in presence of the fact that precisely the same purpose was subserved whatever name be given to the defense. Inasmuch as the plaintiff recovered a much larger sum, whether a counterclaim, recoupment or set-off, the opposing demand, if allowed by the jury, would necessarily be in effect a diminishing of the plaintiff's claim, and this, to some extent, would seem from the verdict to have been done, as the sum assessed by the jury is less by $25 than that demanded in the complaint, or it has been disallowed altogether.
We have carefully considered the instructions asked and denied or modified, and those given to the jury, in the light, of the full evidence as reported, and are unable to find any reviewable error in either.
There is no dispute that the defendant's agreement with Ransley required the latter to furnish all the materials and do all the work in putting up the house, doing what is called "a turnkey job," for all which the former was to pay for the work as it progressed definite sums until it was completed. It is also not denied that the (678) material for the value of which the suit is brought was supplied by the plaintiff and entered into the construction of the house. So the only question is, were these supplies furnished to the one or the other of these contracting parties, and do the facts proved authorize the inference that they were on the credit of the defendant with his assent, from which a contract to pay for them may be implied? This the jury found, and there was no direction asked to be given to the jury that there was no evidence warranting the verdict, and no complaint can now be entertained here for the failure to give such an instruction.
The fourth instruction refused is outside the controversy, for it is not whether the defendant became collaterally liable for the debt of Ransley, under the Statute of Frauds, but whether he contracted himself for the goods, and therefore the evidence did not admit of such charge. *Page 527 
The sixth instruction was properly refused upon the ground stated by the judge, for it was not material the plaintiff had or had not paid for so much of the lumber as he got of Petty Co. — the Bush Hill bill — if as his material thus acquired they were furnished to the defendant under a contract with him.
We find no error in the record of which the defendant can complain, and the judgment must be and is
Affirmed.
Cited: Blake v. Broughton, 107 N.C. 227, 229; Townsend v. Williams,117 N.C. 337; Beaman v. Ward, 132 N.C. 69; Hodges v. Wilson, 165 N.C. 327;Cropsey v. Markham, 171 N.C. 46; Sewing Machine Co., v. Burger,181 N.C. 245; Burris v. Litaker, ibid., 377.
(679)